IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN THE MATTER OF THE SEARCH OF:
**TARGET DEVICES #1, #2, #3, #4, and #5**

Case No. 25-mj-08054-TJJ

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Clint Hawkins, Senior Special Agent with the Kansas Bureau of Investigation (KBI) and Task Force Officer (TFO) for the United States Department of Homeland Security (DHS), Homeland Security Investigations (HSI), being of legal age, having first been sworn upon my oath, state and depose as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of applications under Federal Rule of Criminal Procedure 41 for search warrants authorizing the examination of electronic devices, described in Attachments A1, A2, A3, A4, and A5, which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I, Clint Hawkins, am a full-time state certified law enforcement officer with the Kansas Bureau of Investigation (KBI).  I have been employed at the KBI since 2006 and have been assigned to both the Field Investigations Division and Special Operations Division. Currently, I serve as a Task Force Officer (TFO) at the Homeland Security Investigations (HSI). I was assigned to this position in July 2023 and completed the TFO in-service in February 2024. My duties as a KBI TFO to HSI include drug, financial fraud, and money laundering investigations.

1

3.      Prior to working at the KBI, I was employed by the United States Secret Service from 2003-2005, where many of my investigations involved fraud and counterfeit United States currency. I have received my law enforcement certification from the Federal Law Enforcement Training Center (FLETC) with a reciprocity course completed at the Kansas Law Enforcement Training Center (KLETC).

4.      During the course of my law enforcement career, I have received numerous trainings in criminal investigations, including but not limited to person crimes, illegal narcotics investigations, child crimes, tactical training (SWAT), active shooter, first-line supervision, fraud crimes, and more. I have also completed the training for and become a Certified Fraud Examiner and an Association of Certified Anti Money Laundering Specialists. I have been a police instructor on several disciplines such as firearms instructor and fraud examinations. I, by way of casework, have been a part of many criminal investigation types where I have written cell phone search warrants. During the course of these investigations, I have reviewed the portable case files produced from cell phone forensic searches providing the contents of cell phones in case types involving illegal narcotics, Child Sexual Abuse Material (CSAM), homicides, theft, and weapons.

5.      I received my Bachelor of Science in Spanish, with a minor in Portuguese, at the United States Military Academy, West Point, New York.

6.      The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from other law enforcement officers, my review of documents and computer records related to this investigation, and information gained through my training and experience. This affidavit is intended to merely show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.     The property to be searched are described in Attachments A1, A2, A3, A4, and A5, and are as follows:

a.     A black Apple iPhone, with a lock screen photograph of Uriel Jose BALDERAS and an unknown female, and a red and black "Aitotem" protective case, seized from the vehicle occupied by U. BALDERAS on March 28, 2025, and further described in Attachment A1 (hereinafter "**Target Device #1**");

b.     A black Apple iPhone, with a damaged screen, and in a clear case containing a 10 Honduran Lempiras currency bill, seized on March 28, 2025 from the vehicle occupied by Elder Josue Gomez TABORA, and further described in Attachment A2 (hereinafter "**Target Device #2**");

c.     A metallic silver/teal colored Marca: Honor cell phone, bearing IMEI #1 869231071744602 and IMEI #2 869231072644603, seized on March 28, 2025 from the vehicle occupied by Elder Josue Gomez TABORA, and further described in Attachment A3 (hereinafter "**Target Device #3**");

d.     A black Apple iPhone, with a lock screen image of Manuel CUELLAR-AMEZQUITA, seized on March 28, 2025 from the vehicle occupied by CUELLAR-AMEZQUITA, and further described in Attachment A4 (hereinafter "**Target Device #4**");

e.     A black Apple iPhone, seized on March 28, 2025 from the vehicle occupied by Jorge Humberto Garcia CUELLAR, and further described in Attachment A5 (hereinafter "**Target Device #5**");

8.     The foregoing devices are collectively referred to herein as the "**Target Devices**."

9.      Based on my training, experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846, that is, distribution of controlled substances, possession with the intent to distribute controlled substances, and conspiracy to distribute controlled substances; 21 U.S.C. § 843(b), that is, use of a communication facility to facilitate a drug trafficking crime; and 18 U.S.C. §§ 2, 1956(a) and (h), that is, money laundering and conspiracy to commit money laundering and aiding and abetting the commission of the listed offenses (the "**Target Offenses**"), have been committed by URIEL JOSE BALDERAS, ELDER JOSE GOMEZ TABORA, MANUEL HUMBERTO CUELLAR-AMEZQUITA, and JORGE HUMBERTO GARCIA-CUELLAR.  Furthermore, I believe there is probable cause to search the **Target Devices** for evidence of the **Target Offenses** involving U. BALDERAS, E. TABORA, M. CUELLAR-AMEZQUITA, J. CUELLAR, and others, both known and unknown.  The applied-for warrants would authorize the forensic examination of the **Target Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.  At the time of this search warrant application, the **Target Devices** are located in the District of Kansas.

## FACTS ESTABLISHING PROBABLE CAUSE

10.      Beginning on or about March 17, 2025, a Kansas Bureau of Investigation (KBI) confidential informant (CI) was in contact with Manuel CUELLAR-AMEZQUITA (hereinafter referred to as M. CUELLAR-AMEZQUITA) regarding the purchase of approximately 15 kilograms of methamphetamine in exchange for $2700 per kilogram.  This CI has been proven reliable, based on information that was independently corroborated by investigators, and is working for monetary value.  The CI communicated with M. CUELLAR-AMEZQUITA via M. CUELLAR-AMEZQUITA's phone number ((913) 553-7370).  M. CUELLAR-AMEZQUITA

informed the CI that he, or another associate known to the CI as "Manuel Contacto," would be the individuals responsible for obtaining the methamphetamine. "Manuel Contacto's" phone number ((913) 401-5226) was provided to the CI following a previous controlled methamphetamine purchase by M. CUELLAR-AMEZQUITA's associate.

11.    On Tuesday, March 25, 2025, the CI texted "Manuel Contacto's" (913) 401-5226 number and informed "Manuel Contacto" the CI would be ready to purchase 15 kilograms the following day. All text messages between the CI, M. CUELLAR-AMEZQUITA, and "Manuel Contacto" were in Spanish. The CI asked "Manuel Contacto" to let the CI know when and where to meet. "Manuel Contacto" initially advised the CI it would be after 6:00 p.m., in Kansas, and later set a time of 7:30 p.m. at "mi pueblito" (a grocery store/meat market at 1311 Minnesota Avenue, Kansas City, Kansas).

12.    On March 26, 2025, the CI contacted M. CUELLAR-AMEZQUITA's (913) 553-7370 number, regarding the Mi Pueblito transaction at 7:30 p.m. M. CUELLAR-AMEZQUITA informed the CI that he (M. CUELLAR-AMEZQUITA) would not be able sell the methamphetamine because the load had not arrived yet. M. CUELLAR-AMEZQUITA believed it would be available the following day and would then be able to sell the 15 kilograms. On Thursday, March 27, 2025, the CI informed M. CUELLAR-AMEZQUITA the CI would not be able to do anything that day, but was able on Friday, March 28, 2025. The CI provided a time of 3:00 p.m. and the same original location to meet.

13.    On March 28, 2025, "Manuel Contacto" texted the CI about meeting at 2:00 p.m. The CI responded that he/she could meet at 3:00 p.m. "Manuel Contacto" agreed to it with a 'thumbs up' emoji. At approximately 2:35 p.m., "Manuel Contacto" informed the CI that he ("Manuel Contacto") was ready and was waiting for the CI. The CI asked what "Manuel Contacto"

drove. "Manuel Contacto" replied with his work vehicle. Based on a previous methamphetamine controlled purchase with "Manuel Contacto," the CI knew the work vehicle was a maroon van.

14.     On the same date, the CI drove to the Mi Pueblito parking lot (1311 Minnesota Avenue, Kansas City, Kansas) with a KBI Undercover Agent (UCA). The UCA parked the vehicle in the south side of the Mi Pueblito parking lot. A maroon van, utilized during two previous 1 kilogram methamphetamine transactions with the UCA, pulled up to a spot on the west side of the UCA's vehicle. The UCA observed M. CUELLAR-AMEZQUITA as the maroon van's driver. A passenger (later identified as "Manuel Contacto"/Fernando Last Name Unknown (LNU)) exited the maroon van and approached the passenger's side of the UCA's vehicle. The UCA believed the passenger was the same person ("Manuel Contacto") who sold two kilograms of methamphetamine the previous month to the CI and UCA from the maroon van. The van's passenger (later identified as FERNANDO LNU), M. CUELLAR-AMEZQUITA, the UCA, and the CI began discussing the price for the methamphetamine. The UCA asked to see the drugs first. M. CUELLAR-AMEZQUITA walked over to a black Dodge Ram truck, bearing Missouri license plate 9DFMG8, which was parked on the other side of the UCA's vehicle. This same black Dodge Ram truck was utilized in two previous methamphetamine transactions (February 18, 2025 and February 21, 2025) involving M. CUELLAR-AMEZQUITA, the UCA, and the CI.

15.     The Dodge Ram's driver, later identified as ELDER JOSUE GOMEZ TABORA (hereinafter referred to as E. TABORA), exited the Dodge Ram, stepped up on the rear bumper, and assisted with moving a bag out of the way. The Dodge Ram's truck bed appeared to contain several large black trash bags. M. CUELLAR-AMEZQUITA leaned over the truck's tailgate and opened up a gray paint can lid, from a five gallon paint container, to show sealed plastic bags containing a crystal substance. E. TABORA was standing over M. CUELLAR-AMEZQUITA'S

shoulder looking down into truck's bed while M. CUELLAR-AMEZQUITA exposed the bags of methamphetamine to the UCA. E. TABORA then reentered the Dodge Ram truck and waited. The UCA and M. CUELLAR-AMEZQUITA walked back to the UCA vehicle to discuss the money. FERNANDO LNU was standing at the UC vehicle's passenger door when the UC observed law enforcement in the area. The UCA told FERNANDO LNU the CI and UCA needed to leave. FERNANDO LNU said something to M. CUELLAR-AMEZQUITA and began walking to the store. Surveillance units also observed a white Ford Escape (occupied by two Hispanic males), with Kansas license plate number 1227ACH, in the parking lot. Prior to the operation, the white Ford Escape pulled into the parking lot and a Hispanic male, wearing a blue shirt and ball cap, exited the Ford Escape. The unknown Hispanic male was later determined to be FERNANDO LNU. FERNANDO LNU walked to the passenger seat of the maroon van and got in. The Ford Escape stayed in the parking lot until departing with the maroon van. Pre-operational surveillance units observed the black Dodge Ram parked next to the white Ford Escape. Investigators observed a person walking between the Dodge Ram and Ford Escape, but were unable to determine the person's identity.

16.    Upon arrival of a marked law enforcement vehicle in the parking lot, all of the vehicles involved in this transaction departed the area. Surveillance units observed the Dodge Ram truck depart the parking lot and drive around. The Dodge Ram eventually parked beside Bonito Michoacan, 1147 Minnesota Avenue, Kansas City, Kansas. The Dodge Ram's driver, and sole occupant (E. TABORA) exited the truck and went inside the store. When E. TABORA left the store, law enforcement arrested him. While conducting surveillance on the Dodge Ram, investigators determined no one manipulated the items in the Dodge Ram's truck bed between the

times M. CUELLAR-AMEZQUITA showed the UCA the paint cans and when the cans were seized for evidence.

17.     A subsequent search of the Dodge Ram revealed two gray five-gallon paint cans, located in the truck bed, which contained 15 plastic bags of a crystal substance. A KBI Senior Special Agent field tested the substance and received a presumptive positive result for methamphetamine. The plastic bags, containing the methamphetamine, weighed approximately 15,218 grams.

18.     The maroon van left the Mi Pueblito parking lot shortly after the UCA and black Dodge Ram departed. The maroon van turned south on 13th Street, followed by the white Ford Escape, bearing Kansas license plate 1227ACH. Investigators followed these vehicles until they were stopped by law enforcement. Investigators identified M. CUELLAR-AMEZQUITA as the driver, and sole occupant, of the maroon van. The other person investigators observed in the maroon van ("Manuel Contacto"/FERNANDO LNU) never returned to the van after law enforcement was spotted. Investigators identified URIEL JOSE BALDERAS (hereinafter referred to as U. BALDERAS) as the white Ford Escape's driver and JORGE HUMBERTO GARCIA CUELLAR (hereinafter referred to as J. CUELLAR) as the back seat passenger in the white Ford Escape. Investigators identified J. CUELLAR as the person who delivered 1 kilogram of methamphetamine during a previous controlled purchase on February 18, 2025.

19.     Following his arrest, ELDER JOSUE GOMEZ TABORA (E. TABORA – the Dodge Ram's driver) agreed to speak with investigators. After waiving his *Miranda* Rights, E. TABORA said he currently resides in Kansas City, Kansas and is not a United States citizen. E. TABORA said he currently lives with JORGE HUMBERTO GARCIA CUELLAR (J. CUELLAR) at 2921 Parkwood Boulevard, Kansas City, Kansas, and has for the last three months.

E. TABORA said he works for J. CUELLAR in the construction business. E. TABORA knew J. CUELLAR as M. CUELLAR-AMEZQUITA's nephew. J. CUELLAR instructed E. TABORA to drive the black Dodge Ram truck to a business with two paint buckets in the back. J. CUELLAR told E. TABORA someone would come by to pick up the two paint buckets. E. TABORA would receive $50 for doing this. E. TABORA rode as a passenger while J. CUELLAR drove the black Dodge Ram to the methamphetamine transaction location. E. TABORA said J. CUELLAR exited the Dodge Ram's driver's side and walked to the white Ford Escape parked next to it. Prior to exiting, J. CUELLAR directed E. TABORA where to drive to. J. CUELLAR departed with the Ford Escape and E. TABORA did not see him again. E. TABORA drove to another business parking lot and parked. E. TABORA exited the Dodge Ram and moved a bag which covered the paint cans. E. TABORA said M. CUELLAR-AMEZQUITA walked over to the black Dodge Ram and opened up one of the paint cans. After M. CUELLAR-AMEZQUITA opened the can and walked away, E. TABORA departed the parking lot. E. TABORA drove to another business and went inside. When he departed the business to return to the Dodge Ram, he was arrested by law enforcement. E. TABORA said he used his phone (**Target Device #3**) to communicate with J. CUELLAR during the time of the transaction through WhatsApp.

20. Following his arrest, URIEL JOSE BALDERAS (U. BALDERAS) agreed to speak with investigators. After waiving his *Miranda* Rights, U. BALDERAS said he was from Emporia, Kansas. U. BALDERAS said he came to Kansas City, Kansas (in the white Ford Escape) to meet with J. CUELLAR to pick up a methamphetamine package to take back to Emporia, Kansas. U. BALDERAS was supposed to give one of the packages to an unknown male known as 'Omar.' After he arrived in Kansas City, U. BALDERAS said he met an unknown male, dressed in a blue shirt, at a residence off of Parkwood Boulevard, Kansas City. U. BALDERAS said he gave this

unknown male a ride to an area near 13th Street and Minnesota Avenue, Kansas City, Kansas. At this location, J. CUELLAR entered U. BALDERAS' white Ford Escape via the rear passenger's seat. They (U. BALDERAS and J. CUELLAR) drove to a business near 1311 Minnesota Avenue, Kansas City, Kansas, where the unknown male in the blue shirt departed U. BALDERAS' Ford Escape. While sitting near the business, U. BALDERAS observed law enforcement arrive. The other vehicles departed and J. CUELLAR told U. BALDERAS to follow the other two vehicles. U. BALDERAS was able to follow the maroon van for a brief time before losing it. U. BALDERAS said he was later stopped by law enforcement and arrested. Investigators recovered U. BALDERAS' phone (identified as A black Apple iPhone, with a lock screen photograph of Uriel Jose BALDERAS and an unknown female, and a red and black "Aitotem" protective case [**Target Device #1**]) from the white Ford Escape driver's floorboard.

21.     Following his arrest, JORGE HUMBERTO GARCIA-CUELLAR (J. CUELLAR) agreed to speak with investigators. After waiving his *Miranda* Rights, J. CUELLAR said U. BALDERAS brought methamphetamine with him in the white Ford Escape from Emporia, Kansas. J. CUELLAR drove the maroon van (previously identified on prior drug transactions) to meet U. BALDERAS at a location near 9th Street and Parkwood Boulevard, Kansas City, Kansas. J. CUELLAR, M. CUELLAR-AMEZQUITA, and FERNANDO LNU were all working at another location and drove to this residence near 9th Street and Parkwood Boulevard to meet U. BALDERAS. J. CUELLAR said he and M. CUELLAR-AMEZQUITA are related, as M. CUELLAR-AMEZQUITA is J. CUELLAR'S uncle. J. CUELLAR also owns a painting business (Precision Painting), which reportedly employs M. CUELLAR-AMEZQUITA and FERNANDO LNU. At the residence near 9th Street and Parkwood Boulevard, J. CUELLAR said that U. BALDERAS pulled a cardboard box, containing methamphetamine, from the white Ford Escape's

rear hatch compartment.  The methamphetamine (sealed in plastic bags) was removed from the box and transferred into two 5-gallon paint buckets in the back of his (J. CUELLAR's) black Dodge Ram truck.  J. CUELLAR drove the maroon van to Mi Pueblito, 1311 Minnesota Avenue, Kansas City, Kansas.  The black Dodge Ram truck was driven to the same location by another individual (J. CUELLAR did not identify U. BALDERAS).  J. CUELLAR said they were there to meet someone (the KBI CI) for a drug transaction that was arranged by M. CUELLAR-AMEZQUITA.  J. CUELLAR said the transaction was facilitated by cell phone communication by the CI.   After arriving to Mi Pueblito (1311 Minnesota Avenue, Kansas City, Kansas), J. CUELLAR said he went inside Mi Pueblito and did not observe the transaction. When J. CUELLAR departed the store, he realized all of the vehicles had departed, except the white Ford Escape.  J. CUELLAR said he entered the white Ford Escape and left before being stopped by law enforcement.

22.     On March 28, 2025, investigators seized a black Apple iPhone, with a lock screen photograph of Uriel Jose BALDERAS and an unknown female, and a red and black "Aitotem" protective case, from the white Ford Escape driven by U. BALDERAS.  This cell phone (Target Device #1) is further described in Attachment A1.  Investigators determined Target Device #1 belongs to U. BALDERAS from the photograph on the screen saver and location it was discovered.

23.     On March 28, 2025, investigators seized a black Apple iPhone, with a damaged screen, and in a clear case containing a 10 Honduran Lempiras currency bill, from the black Dodge Ram pick-up driven by Elder Josue Gomez TABORA.  This cell phone (Target Device #2) is further described in Attachment A2.  E. TABORA was shown a photograph of Target Device #2, agreed it was his phone, provided the passcode for the phone, and consented to the search of Target Device #2.

24.    On March 28, 2025, investigators seized a metallic silver/teal colored Marca: Honor cell phone, bearing IMEI #1 869231071744602 and IMEI #2 869231072644603, from the black Dodge Ram pick-up driven by Elder Josue Gomez TABORA. This cell phone (Target Device #3) is further described in Attachment A3.  No one claimed ownership of this phone. E. TABORA claimed the phone was already in the vehicle when he drove it.  As investigators knew J. CUELLAR regularly drove Dodge Ram truck, there is probable cause to believe Target Device #3 belongs to J. CUELLAR and is associated with the events on March 28, 2025.

25.    On March 28, 2025, investigators seized a black Apple iPhone, with a lock screen image of Manuel CUELLAR-AMEZQUITA, from the maroon van driven by M. CUELLAR-AMEZQUITA.  This cell phone (Target Device #4) is further described in Attachment A4.  M. CUELLAR-AMEZQUITA was the sole occupant of the vehicle when law enforcement encountered it, and his photograph is displayed on the lock screen.

26.    On March 28, 2025, investigators seized a black Apple iPhone from the white Ford Escape Jorge Humberto Garcia CUELLAR was located as a passenger in.  This cell phone (Target Device #5) is further described in Attachment A5.  J. CUELLAR consented to law enforcement searching Target Device #5.

27.    Based on my training, experience, and conversations with other law enforcement officers, I believe MANUEL HUMBERTO CUELLAR-AMEZQUITA, JORGE HUMBERTO GARCIA-CUELLAR, URIEL JOSE BALDERAS, and ELDER JOSUE GOMEZ TABORA were present in the same area in three different vehicles in order to facilitate a large drug transaction. Not only did different individuals move from one vehicle to another, but the vehicles also met sporadically with each other.  Your Affiant believes the timed coordination of this was completed through the use of cellular phones which each person was discovered with upon their arrest.

Furthermore, the drug transaction was facilitated for the purpose of financial gain through the parties involved. M. CUELLAR-AMEZQUITA set the initial price of the methamphetamine, E. TABORA transported the product for a monetary amount, and J. CUELLAR was also promised an amount of money for his participation in the transaction. The proceeds from the sale of the product were arranged to be in Federal Reserve Notes which were not tied to the specific sale of the methamphetamine.

## **TECHNICAL TERMS**

28.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Cell phone: A cell phone (or mobile phone, or wireless phone) is a handheld wireless device used for voice and data communication through radio signals. These phones send signals through networks of transmitter/receivers, enabling communication with other wireless phones or traditional "land line" phones. A cell phone usually contains a "call log," which records the phone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless phones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cell phones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed

and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those

14

signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.     PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

      f.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      g.     IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0–255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its

destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

29. Based on my training, experience, and research, I know the **Target Devices** are "smart phones" that serve as, but not limited to: a cell phone, a digital camera and video recorder, a portable media player, a GPS navigation device, a personal data assistant, and an internet explorer; and may also contain mobile applications, including social media applications, installed on the devices, that can be utilized to send voice, text, and multimedia messages.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence that establishes how the **Target Devices** were used, the purpose of their use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Target Devices** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

16

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the device consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

33.    *Manner of execution.* Because these warrants seek only permission to examine the device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

34.    *Specialized Examination and Location.* The **Target Devices** described in Attachments A1, A2, A3, A4, and A5 were seized in the District of Kansas. The examination of the **Target Devices** will be conducted locally by a KBI agent familiar with digital media collection. However, in the event that obtaining the information described in Attachment B from the property described in Attachments A1, A2, A3, A4, and A5 requires the use of a qualified computer expert in a laboratory or other controlled environment, I will utilize national HSI resources to conduct the forensic analysis described in this affidavit and in Attachment B.

35.    Finally, the requested warrant would also authorize law enforcement officers to make and retain functional copies of the audio and video files stored on the **Target Devices**, and to review those copies for evidence of crimes against the United States and the State of Kansas, in addition to those outlined within the scope of the warrants. If evidence of additional crimes outside the scope of the current warrants are discovered within the data copied from the **Target Devices**, additional search warrants will then be sought seeking evidence of those crimes. The copied audio and video files will be the sole property of HSI, and thus may be shared with other federal and state law enforcement officers and court officials to whom these videos may be of evidentiary value in past, current, and future investigations. Those copied audio and video files will be retained by the HSI until the conclusion of this investigation.

## **CONCLUSION**

36.     Based on the foregoing, I respectfully submit that there is probable cause to believe the **Target Devices** presently contain or constitutes evidence of the **Target Offenses**.  I therefore request a warrant to search the **Target Devices** described in Attachments A1, A2, A3, A4, and A5 for the items set forth in Attachment B.

Respectfully submitted,

*Clint Hawkins*_____
Special Agent Clint Hawkins
Kansas Bureau of Investigations
Homeland Security Investigations, TFO

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on March _29___, 2025.

_____*Teresa James*_____
HONORABLE TERESA J. JAMES
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A1
## PROPERTY TO BE SEARCHED

A black Apple iPhone, with a lock screen photograph of Uriel BALDERAS and an unknown female, with a red and black "Aitotem" protective case, seized on March 28, 2025, from the vehicle occupied by U. BALDERAS on March 28, 2025 ("**Target Device #1**"), as pictured below.



**ATTACHMENT A2**
**PROPERTY TO BE SEARCHED**

A black Apple iPhone, with a damaged screen, in a clear case containing a 10 Honduran Lempiras currency bill, seized on March 28, 2025, from the vehicle occupied by Elder Josue Gomez TABORA ("**Target Device #2**"), as pictured below.



**ATTACHMENT A3**
**PROPERTY TO BE SEARCHED**


A metallic silver/teal colored Marca: Honor cell phone, bearing IMEI #1

869231071744602 and IMEI #2 869231072644603, seized on March 28, 2025, from the vehicle

occupied by Elder Josue Gomez TABORA ("**Target Device #3**"), as pictured below.



**ATTACHMENT A4**
**PROPERTY TO BE SEARCHED**

A black Apple iPhone, with a lock screen image of Manuel CUELLAR-AMEZQUITA,
seized on March 28, 2025, from the vehicle occupied by CUELLAR-AMEZQUITA ("**Target
Device #4**"), as pictured below.



**ATTACHMENT A5**
**PROPERTY TO BE SEARCHED**


A black Apple iPhone, seized on March 28, 2025 from the vehicle occupied by Jorge

Humberto Garcia CUELLAR ("**Target Device #5**"), as pictured below.




## ATTACHMENT B
## Items to be Seized

All records, data, and information on the Target Devices (described in the Affidavit and Attachments A1, A2, A3, A4, and A5) relating to violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), 843(b), 846, and Title 18, United States Code, Sections 2, 1956(a) and (h).  After the initial imaging, the examiner and agents will not further save or copy data unrelated to these violations.  To the extent possible, the examiner and agents will minimize the review of unrelated data.  Probable cause exists to believe the information and items, listed herein, will be located in the referenced Target Devices, including:

a. Lists of customers and related identifying information;

b. Any information recording meetings, deliveries, the schedule and travel of the parties involved in drug trafficking;

c. All bank records, checks, credit card bills, account information, wire transfer and other financial records;

d. Records and documents related to residences utilized;

e. Contact information, incoming and outgoing call information, pictures, videos, stored voicemail and text messages;

f. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

g. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

h. Target Device ownership and user information, including evidence of user attribution showing who used or owned the particular Target Device at the time the things described in the

warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

i. Records evidencing the Internet Protocol address, the use of said address and any records of other Internet Protocol addresses used;

j. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k. Photographs, images, and videos of drug trafficking activity, drug trafficking associates, instrumentalities or proceeds of drug trafficking; including stored information related to the date, time, user and owner of the device, and location of the image generation.

l. Any geotagging information such as the camera's date and time clock, make and model, serial number, and location of photographs and videos determined by the camera's Global Positioning System receiver or geotagging tool, including any identification information related to the use and ownership of the devices. This also includes cell tower information, GPS coordinates, and location services commonly used and stored by cell phones and their applications during normal use of the device(s).

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory, thumb drives, or other media that can store data) and any photographic form.